UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

FAIR HOUSING JUSTICE CENTER, INC.;
JAMES BECTON, SAMUEL GATES; and                          17-CV-6017
KENT JACKMAN;
                                                         **COMPLAINT AND**
                          Plaintiffs,                    **DEMAND FOR JURY TRIAL**

                  v.

THE PARKOFF ORGANIZATION a/k/a
PARKOFF OPERATING CORP.;
A. RICHARD PARKOFF; ADAM PARKOFF;
2828 KINGS ASSETS LLC;
ANITA ZENELAJ; 401 REALTY LLC;
and JENNIFER CONTICELLI,

                          Defendants.

--------------------------------------------------------------X

        Plaintiffs Fair Housing Justice Center, Inc., James Becton, Samuel Gates, and

Kent Jackman, by and through their attorneys, Cuti Hecker Wang LLP, for their Complaint

allege as follows:

                              <u>**INTRODUCTION**</u>

        1.      The Parkoff real estate empire is a family-run business that has existed for nearly

a century, built on expansive purchases of a variety of buildings throughout New York City.

Today, the Parkoff family and Parkoff-affiliated entities own more than 75 residential rental

buildings controlling over 4,500 units of rental housing.  Defendants are the Parkoff

Organization (also known as Parkoff Operating Corp.), father-and-son owners/officers, A.

Richard and Adam Parkoff, two Parkoff-related entities, and two lower level employees

(collectively, "Defendants").

2.      The Parkoff Organization is no stranger to discrimination.  Over 25 years ago, it

was sued for systematically lying to African Americans and Hispanics, and denying them the

opportunity to rent apartments in eight Parkoff buildings.  That lawsuit resulted in a three-year

Consent Decree and Order that prohibited the Parkoff Organization from further discrimination,

and required extensive training and monitoring of its activities to ensure it would not shut out

African Americans or Hispanics again.

3.      But the Parkoff Organization plainly did not learn its lesson.  It continues to flout

the laws aimed at ensuring fair and equal access to housing in New York City, lying to African

Americans about availability and rent rates in at least one of its buildings, refusing to rent

available apartments if the applicant receives federal rent assistance in another building, and

imposing burdensome and unnecessary requirements on families with small children in a wide

variety of buildings.

4.      Throughout 2016, the Fair Housing Justice Center ("FHJC"), a non-profit

organization dedicated to ensuring that all people have equal access to housing opportunities in

the New York City region, sent African American and white testers to the Parkoff-owned and

managed 2828 Kings Highway building, posing as prospective tenants.  In multiple tests, African

Americans were told that no apartments were available and sent away, while white applicants –

in one instance, sent in just an hour after an African American – were ushered in to view

available apartments, connected to current tenants who were in search of someone to take over

their leases, and quoted lower rent prices.

5.      Then, in May 2017, FHJC confirmed through a different investigation that

Defendants were discriminating on a different basis in the rental of units at another one of their

buildings in Crown Heights, Brooklyn.  An FHJC tester posing as a potential applicant at

Parkoff's building located at 401 Schenectady Avenue was turned away after she disclosed that she relied upon federal assistance to pay her rent, despite the acknowledged availability of apartments in the building.  These actions are in plain violation of New York City anti-discrimination law.

6.      Finally, during the course of these investigations, FHJC also learned of yet a third way that Defendants routinely discriminate, this time against families with children. Specifically, the Parkoff Organization apparently subjects families with children under the age of seven to an additional requirement that it does not impose on other prospective tenants—requiring blood tests of children before permitting such a family to move in to prove they are lead-free.   Such requirements are not just invasive and unnecessary, but also unquestionably discriminatory and prohibited.

7.      Defendants' extensive and systematic discrimination must stop.  Their behavior is not simply offensive: it causes enormous harm, both through the degradation of the individuals who are treated as less valuable or worthy than those who are granted housing opportunities without restriction, and to New York City as a whole, which remains segregated and divided as a result of their systemic and invidious behavior.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and pursuant to 42 U.S.C. § 3613.

9.      Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b)(2).

## JURY DEMAND

10.     Plaintiffs hereby demand a trial by jury.

3

## PARTIES

11.     Plaintiff FHJC is a non-profit organization incorporated in the State of New York and based in New York City.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.  FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory housing policies and practices, which diverted resources away from other FHJC activities.  Defendants' discriminatory housing policies and practices also frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in the New York City region.

12.     Plaintiff James Becton is an African American man who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Becton worked for FHJC as a tester.   Plaintiff Becton was harmed by Defendants' conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

13.     Plaintiff Samuel Gates is an African American man who is a citizen of the United States and a resident of Chapel Hill, North Carolina.  At all relevant times, Plaintiff Gates worked for FHJC as a tester.   Plaintiff Gates was harmed by Defendants' conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

14.     Plaintiff Kent Jackman is an African American man who is a citizen of the United States and a resident of Jersey City, New Jersey.  At all relevant times, Plaintiff Jackman worked for FHJC as a tester.   Plaintiff Jackman was harmed by Defendants' conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

15.     Parkoff Operating Corp., also known as the Parkoff Organization ("Parkoff"), has its principal place of business at 98 Cuttermill Road in Great Neck, New York 11021.  On

information and belief, Parkoff Operating Corp. does much, if not all of its business as the

Parkoff Organization, and owns and operates more than 75 residential rental buildings

throughout New York City with over 4,500 units of rental housing.  On information and belief, at

all times relevant to this action, Parkoff owned, managed, and/or otherwise controlled residential

apartment buildings located at 2828 Kings Highway, Brooklyn, New York, and 401 Schenectady

Avenue in Brooklyn, New York. Defendant A. Richard Parkoff is the President of the Parkoff

Organization.

16.     Upon information and belief, Defendant 401 Realty LLC is the owner-entity of

the building at 401 Schenectady Avenue in Brooklyn, New York 11213 ("the Schenectady

Building"), which controls or should control the management and operation of that building.

Defendant A. Richard Parkoff is the Manager of 401 Realty LLC, and on information and belief,

oversees the corporation.

17.     Defendant 2828 Kings Assets LLC is the owner-entity of the building located at

2828 Kings Highway in Brooklyn, New York 11229 ("the Kings Highway Building"), which

controls or should control the management and operation of that building.  Defendant A. Richard

Parkoff is the Organizer of 2828 Kings Assets LLC, and on information and belief, runs the

corporation.

18.     Defendant A. Richard Parkoff is listed in organizing documents as the President

of the Parkoff Organization, the Manager of 401 Realty LLC, and the Organizer of 2828 Kings

Assets LLC.  As such, upon information and belief, Defendant A. Richard Parkoff is responsible

for establishing, supervising, and enforcing the policies and practices through which apartments

at both buildings are rented, through which tenants are selected, and through which the forms

and requirements for family-applicants are implemented, and/or controls or should control

employees, agents and/or independent contractors who rent out available apartments at either building.

19. Upon information and belief, Defendant Adam Parkoff has a leading role in overseeing the day-to-day managing of the operations of Parkoff as well as 401 Realty LLC and 2828 Kings Assets LLC, and routinely holds himself out publicly as a Principal of Parkoff. Upon information and belief, Adam Parkoff is responsible for establishing, supervising, and enforcing the policies and practices through which apartments at both buildings are rented and through which tenants are selected, and/or controls or should control employees, agents and/or independent contractors who rent out available apartments at either building.

20. Defendant Anita Zenelaj is a natural person residing at 2828 Kings Highway in Brooklyn, New York 11229. Upon information and belief, Zenelaj is the superintendent of the Kings Highway Building. Upon information and belief, at all relevant times, Zenelaj was an employee, agent and/or independent contractor of Parkoff and/or 2828 Kings Assets LLC with actual and/or apparent authority to inform prospective tenants about apartments at the Building, show prospective tenants apartments, screen applicants for suitability, and provide prospective tenants with applications for apartments and/or otherwise place or refuse to place prospective tenants.

21. Upon information and belief, Defendant Jennifer Conticelli works for and/or has actual or apparent authority to place tenants and/or enforce policies about renting out apartments at the Schenectady Building on behalf of Parkoff and/or 401 Realty LLC.

## FACTUAL ALLEGATIONS

**FHJC'S TRAINING AND PROTOCOL**

22.　Founded in 2005, the mission of the Fair Housing Justice Center is to eliminate housing discrimination, promote open, accessible, and inclusive communities, and strengthen enforcement of the fair housing laws.

23.　FHJC dispatches individuals as "testers" – persons who pose as prospective renters or homebuyers for the purpose of obtaining information about the conduct of landlords, superintendents, real estate brokers, cooperative and condominium boards, lenders, sellers, and others to determine whether illegal housing discrimination is taking place.

24.　At all relevant times, Plaintiffs Becton, Gates, and Jackman, as well as other testers who inquired about apartments for rent at the Buildings, worked for FHJC as testers.

25.　Prior to participating in the testing investigation of any building, Plaintiffs Becton, Gates, and Jackman, as well as the other testers, received training from FHJC, which included instructions on conducting a test, preparing tester report forms, and using concealed digital audio recorders during tests.

26.　As detailed below, the testing that FHJC and its testers performed demonstrates that Defendants regularly discriminate against African Americans with respect to renting apartments at the Kings Highway Building in violation of federal, state, and local fair housing laws, and further discriminate against people receiving federal vouchers in their rental of apartments in the Schenectady Building in violation of local fair housing laws.  Finally, the tests indicate that Parkoff discriminates against families in the renting of units at many, if not all, of its buildings, by imposing unnecessary and burdensome requirements on families with children of a certain age, also in violation of local fair housing laws.

## THE PARKOFF ORGANIZATION

27.      By all accounts, Parkoff is a family-run real estate empire, built initially nearly a century ago when Defendant A. Richard Parkoff's grandfather (Defendant Adam Parkoff's great-grandfather) accumulated significant New York area property during the Great Depression. Defendant A. Richard Parkoff was quoted in one news article bragging about his family's ability to take advantage of economic downturns:  "In difficult times, like the present, we have always been able to identify prime available properties which others were unsure about or unable to execute," said A. Richard Parkoff in a statement.  "My grandfather survived the Great Depression by purchasing buildings and keeping them rented.  My father continued the strategy in the challenging '40s and post-war decades.  In the '70s I built on his approach based on the premise that there can never be enough quality, well-managed, commercial and residential property in New York".  Dana Rubinstein, *Whew! Parkoff Cements $28 M. All-Cash Deal in 48 Hours*, THE OBSERVER, November 5, 2008.

28.      Today, Parkoff appears to own and operate more than 75 residential rental buildings throughout four boroughs of New York City, controlling over 4,500 units of rental housing.

29.      But Parkoff also has a history of systematically discriminating against African Americans by lying to them about what apartments are available, and denying them the opportunity to apply for apartments in certain buildings.

30.      In 1991, a different New York City fair housing group, the Open Housing Center, brought a class action against Parkoff on behalf of African-Americans and Hispanics who were denied the opportunity to view or apply for available apartments.  *See Batson v. Parkoff*, 1:91-cv-2565 (S.D.N.Y.) (MJL) (1991).  The Complaint in that case detailed how Parkoff, through its

agents and/or employees (1) showed available apartments to white testers while telling African American and Hispanic plaintiffs that no apartments were available for rent or inspection; (2) provided rental applications to white testers but not to African American and Hispanic plaintiffs; and (3) informed white testers that they could apply for apartments through Parkoff's representatives at the relevant building while directing African American and Hispanic plaintiffs to apply through real estate agencies. *See Batson*, 1:91-cv-2565, Complaint (dkt. 1), at 8. The Complaint described systemic racial discrimination at seven different Parkoff apartment buildings in Manhattan and the Bronx.

31.     On October 7, 1992, Parkoff entered into a consent order, signed by Defendant A. Richard Parkoff and approved and entered by Judge Mary J. Lowe, in which Parkoff was enjoined for three years from "discriminating in any matter against any person because of race, color, or national origin in the rental of apartments; denying apartments or housing information to persons on the basis of race, color or national origin; discriminating against any person, because of race, color or national origin, in the terms, conditions or privileges of renting; and from representing to any person, because of race, color, or national origin, that any rental unit is not available for inspection or rental when such unit is in fact so available." *Batson*, 1:91-cv-2565, Consent Order (dkt. 24), at 2–3.

32.     Parkoff had to do more than just promise to follow the law: it expressly agreed to ensure expansive, wide ranging training of all of its agents and employees to make sure this kind of discrimination would not happen in the future. Specifically, the Order required Parkoff to "conduct and complete an educational program for all agents and employees who . . . [had] rental responsibilities or employment responsibilities that include providing information to the public about rental services, or who accept or process applications for rentals, and specifically including

the superintendents of the Target Buildings, to inform them of the provisions of this Consent

Order and of their duties under the Fair Housing Act of 1968. *Id.* at 3. Under the Consent Order,

Parkoff also agreed that "the rental standards and application procedures . . . shall be uniformly

applied to all persons wishing to apply for apartments at the Target Buildings." *Id.* at 6.

33.     The Consent Order also required extensive documentation and wide-ranging

advertising, including outreach to media that reached minority communities.

34.     Over 25 years later, Parkoff is discriminating again.

**FHJC'S INVESTIGATIONS CONFIRM MULTIPLE FORMS OF DISCRIMINATION**

**I.  Rampant Race Discrimination at the Kings Highway Building**

   **A.  White Testers' Preliminary Visits to the Building**

35.     On March 29, 2016, at approximately 1:30 p.m., a white female tester ("White

Tester 1") posing as a prospective tenant went to the superintendent's apartment in the building.

36.     Defendant Anita Zenelaj, who identified herself to the tester as the

superintendent, answered the door.

37.     The white tester asked Defendant Zenelaj whether there were any available

apartments in the Building.

38.     Defendant Zenelaj responded that no apartments were available, but then said that

"hopefully" something would open up. She informed White Tester 1 that one-bedroom

apartments in the building rented for $1500, and that two-bedroom apartments ranged from

$1795 to $2200.

39.     Defendant Zenelaj then volunteered to White Tester 1 that the current tenants of a

two-bedroom apartment might be leaving soon because they had just had another child. She told

White Tester 1 that the tenants were "very religious" Jews, and she did not think that they would allow their children, who were different genders, to share a room.

40.     On August 2, 2016, at around 12:20 p.m., White Tester 1 called the phone number she had seen posted inside the Kings Highway Building for the Kings Highway Building manager, Noelle Biscioni.  She spoke to Michael Okun, the new building manager who had replaced Biscioni.  Okun told White Tester 1 that there were no apartments available at the Kings Highway Building and that he did not know when something might become available, but that she could check in "once in a while" with the building superintendent, Defendant Zenelaj.

41.     On or about August 17, 2016, at around 2:30 p.m., a white male tester ("White Tester 2") posing as a potential tenant visited the Kings Highway Building.  He spoke to Defendant Zenelaj and asked her if there were any apartments available in the building.  Once again, Defendant Zenelaj went out of her way to accommodate White Tester 2, despite the fact that, as she told him, there were no apartments available at the time.  Defendant Zenelaj told White Tester 2 that there would be one "soon" because the tenants in apartment 5D, a one-bedroom, were breaking their lease.  Defendant Zenelaj told White Tester 2 that the current rent was $1550 for the brand new, totally renovated apartment, but that the rent might go up.

42.     Defendant Zenelaj told White Tester 2 that she would know whether apartment 5D would be available before the building manager (Okun) would know, and conspiratorially suggested that White Tester 2 should not tell Okun about any of this yet.  She said, "That would be nice if you took over [from] them," referring to the tenants of apartment 5D.  She told White Tester 2 to leave his number with her, and stated that she would ensure that the tenants of apartment 5D would call him.  Defendant Zenelaj encouraged White Tester 2, telling him that the last time tenants had broken their lease and found their own tenants, it "went smooth."

11

43.     Defendant Zenelaj also praised the building to White Tester 2, saying, "we're in a good building too," that was kept "very clean."   Later, she conveyed how desirable the building was by pointing out that there had been eight available apartments the year before, but that they had all been rented out "boom, boom, boom" to indicate how quickly they had been taken.

44.     Defendant Zenelaj then volunteered her opinions about the Jewish families who rented many of the apartments: "You know, we get a lot of Jewish families that are young and get married.  I don't know if you're Jewish or Orthodox or whatever, what do they call them – Ashkenazis [sic].  They're married and they come, stay here a year, they get pregnant, then they move on."

45.     Before White Tester 2 left, Defendant Zenelaj reiterated that she would tell the current tenant of apartment 5D about him, and that maybe he would receive a call that night.

**B.  The November and December 2016 Tests**

**a.  White Testers Are Assisted and Encouraged to Find Apartments**

46.     On November 9, 2016 around 11:20 a.m., another white male tester ("White Tester 3") visited the Kings Highway Building posing as a potential tenant.   He spoke to Defendant Zenelaj, asking whether any apartments were available.  Defendant Zenelaj told White Tester 3 that no apartments currently were available, but as with White Tester 1 and White Tester 2, Defendant Zenelaj volunteered information about an apartment that would be available soon.  She told White Tester 3 that the tenants in apartment 3G, a one-bedroom that rented for $1550, were breaking their lease.  Defendant Zenelaj told White Tester 3 to call Dana, a leasing agent at the Parkoff Management office.  The 516 area code phone number that Defendant Zenelaj gave to the tester is the same one listed on the Parkoff Organization website

(http://www.parkoff.com/).   She instructed him to tell Dana that, "the super mentioned that 3G is breaking their lease."

47.     Defendant Zenelaj also told White Tester 3 that Parkoff owned other buildings, including one on Ocean Parkway.  She then told White Tester 3 to lower his head so that she could quietly say to him: "But it's super, super Jewish. Like our building is a little more laid back. There are the Israeli Jews that are cool, pick and choose what they want to be, you know. You have the Ashkenazi, the ones who wear the wigs and the skirts and the one in 3G, they're Ashkenazi.  I don't know if you're Jewish.  They're a little more whatever. And this building is cool 'cuz it's diverse, we have like, Russians, Polish, American, Italian, you know, like me Albanian, you know what I mean, it's all diverse."

48.     Defendant Zenelaj encouraged White Tester 3 to speak to the superintendent across the street, and also encouraged him to call the building manager, Okun.

49.     At around 11:30 a.m. on November 9, 2016, White Tester 3 called and spoke with Dana at the Parkoff office.  He told her that Defendant Zenelaj had told him that apartment 3G might become available soon.  Dana at the Parkoff office took White Tester 3's phone number and said that she would pass it along to the current tenant of 3G.

50.     The Parkoff office representative also told White Tester 3 that the rent for apartment 3G would be $1450.

51.     Defendant Zenelaj's behind-the-scenes encouragement and facilitating paid off for the white testers.  Between November 14 and November 29, 2016, the current tenant of apartment 3G, Steven, contacted both White Tester 2 and White Tester 3, and invited them to visit and view the apartment with the goal of having them take over as tenants.

**b. African Americans Are Shut Out of the Building and Quoted Higher Rents**

52.     African-American testers received entirely different treatment from Defendant Zenelaj.

53.     On December 1, 2016 at around 12:30 p.m., Plaintiff Samuel Gates visited 2828 Kings Highway and knocked on Defendant Zenelaj's door.

54.     Defendant Zenelaj stated, "Who is it?" Plaintiff Gates introduced himself and asked to speak to the superintendent.  Defendant Zenelaj responded in an unfriendly tone, "Ok. May I help you?"

55.     Plaintiff Gates told Defendant Zenelaj that he was looking for a one or two-bedroom apartment.  Defendant Zenelaj stated, "None.  We had two but they're already in – today they actually signed the lease.  One is still in the process of the application."  When Plaintiff Gates asked if the apartments were actually taken or if they just had applications in on them, Defendant Zenelaj responded, "One was taken.  The lease was signed today.  The other one, they're in like, almost in the process of signing the lease."

56.     Plaintiff Gates persisted, asking, "But they haven't signed it yet?"  Defendant Zenelaj said no.  Plaintiff Gates asked which apartment it was, stating, "Is it possible if they don't take it that I might, obviously . . . ."

57.     Defendant Zenelaj rudely cut him off, saying, "Well it's still occupied because they're breaking their lease.  So that's why – That, they were responsible to find their own tenant.  Do you get what I mean?  So they put . . . some type of ad or something."

58.     Defendant Zenelaj told Plaintiff Gates that he could leave his number in case something "pop[ped] up."  When Plaintiff Gates asked about the two apartments that had been available, Defendant Zenelaj told him that they were both one-bedrooms, stating, "Two

bedrooms rarely come.  But they're pricey here."  She then quoted different rents than she had

quoted to the white testers, including significantly higher rents for one-bedrooms.  Specifically,

she told Plaintiff Gates that two-bedrooms ranged between $1950 and $2100, while one-

bedrooms ranged from $1500 to $1650.

59.     At the end of the conversation, Defendant Zenelaj told Plaintiff Gates that it had

"just dawned on [her]" that Moshe, the tenant currently in 1F – a two-bedroom apartment –

might be interested in moving into apartment 3G, the one-bedroom that she had just told Plaintiff

Gates was *not* available.  She took Plaintiff Gates's phone number and said that if the applicants

for apartment 3G did not get approved, she would see if Moshe liked apartment 3G.  Notably,

she did not volunteer to Plaintiff Gates that she could contact him directly about apartment 3G,

even though he had explicitly told her when he arrived that he was interested in either a one-

bedroom or a two-bedroom apartment.

60.     When Plaintiff Gates asked if they could go together to see if Moshe was home,

so that he might see the apartment, Defendant Zenelaj said, "I don't think he's home now,

because he works."  She then backpedaled on her offer to connect them, stating, "But that's

another thing.  I don't know if he's willing to give up and go upstairs, if he likes that apartment."

She told Plaintiff Gates that she would "hold" on to his number in the event that Moshe did

decide to move.  She offered to "try to maneuver something."

61.     On December 2, 2016, the day after Plaintiff Gates visited the Kings Highway

Building and spoke to Defendant Zenelaj, another white male tester ("White Tester 4") visited

the building at approximately 1:00 p.m. posing as a potential tenant.  He asked Defendant

Zenelaj about available apartments.  Despite having told Plaintiff Gates the day before that

nothing was available and refusing to show him apartment 3G, Defendant Zenelaj told White

Tester 4 that the tenants of 3G had broken their lease and directed him to go look at the apartment.

62.     After looking at apartment 3G, White Tester 4 returned to speak with Defendant Zenelaj.  When White Tester 4 asked what the rent was, Defendant Zenelaj stated that the current tenant would tell him the rent, but added, "Don't let them push you. $1430, 1428, 1450, don't let it go higher.  'Cuz . . . she will. She'll want $1450."

63.     Defendant Zenelaj told White Tester 4 that the tenants of apartment 3G had left the previous day.  She gave him the phone number for Temina, the tenant, facilitating his ability to connect with the tenant and take over the lease.

64.     Defendant Zenelaj continued to encourage White Tester 4 to reach out immediately, saying, "It's vacant. You can start the 15th . . . . Call her right now. Before Shabbas. Call her now. Say I just spoke to Anita, or text her and say, 'I spoke to the super Anita and I'm interested in 3G.'  I guarantee she'll call you."

65.     Defendant Zenelaj never called Plaintiff Gates to tell him that 3G was available.

66.     On December 7, 2016 at approximately 12:15 p.m., Plaintiff Jackman visited the Kings Highway Building and spoke to Defendant Zenelaj.  He started to tell her that he was looking for a one or two-bedroom apartment, but she quickly cut him off, saying, "Nope. None." Plaintiff Jackman tried again, saying "Nothing available–" but she cut him off again, saying, "Nope."

67.     Plaintiff Jackman continued politely to try to engage with Defendant Zenelaj, asking "Can you tell me when you may have something available. . . ." For a third time, Defendant Zenelaj cut him off, saying curtly, "Very hard."  When Plaintiff Jackman asked if

Defendant Zenelaj was able to project any future openings, she said, "I can't even project because, for the past three years I've [been] here, no."

68.     Defendant Zenelaj seemed to try to direct Plaintiff Jackman away from the Kings Highway Building by mentioning that she had seen the building across the street listed on Zillow.

69.     Plaintiff Jackman asked whether the Kings Highway Building apartments were rented through a broker or directly.  Defendant Zenelaj told him that brokers listed the apartments, but that when a tenant would leave, they would sometimes find their own replacement tenant.  She told him there was no waiting list.

70.     Defendant Zenelaj tried to direct Plaintiff Jackman away from the Kings Highway Building, telling him that Parkoff had other buildings, at 420 Ocean Parkway (which is in Kensington) and "in the Bronx."

71.     Despite having proactively connected several white testers with outgoing tenants in the prior weeks and months – and even whispering to Plaintiff Jackman that she sometimes has "inside info" herself about vacancies – she deliberately failed to inform him about apartment 3G.

72.     Defendant Zenelaj quickly ended the conversation, saying, "As of right now . . . we're completely at–" Plaintiff Jackman said, "Full, right. And nothing projected."  She said, "No."

73.     One day later, on December 8, 2016 at approximately 1:00 p.m., a white female tester ("White Tester 5") visited the Kings Highway Building, posing as a potential tenant.  She told Defendant Zenelaj that her husband had visited a few days before, and that Defendant Zenelaj had showed him apartment 3G.  She asked if she could also take a look.

74.     Although Defendant Zenelaj had told Plaintiff Jackman one day earlier that there were no free apartments, she responded, "sure," and directed White Tester 5 to apartment 3G. Defendant Zenelaj told White Tester 5 that the apartment was supposed to be unlocked throughout the day so people could easily visit and view it.

75.     Defendant Zenelaj told White Tester 5 that the rent for the apartment would be between $1450 and almost $1500.  She explained that the tenants had broken their lease and that a new tenant could begin a new lease.

76.     The very next day, on December 9, 2016 at approximately 2:50 p.m., Plaintiff Becton visited the Kings Highway Building and was directed to Defendant Zenelaj's apartment. When Defendant Zenelaj answered the door, saying "Hi, can I help you?" Plaintiff Becton introduced himself and asked whether there were any one-bedroom apartments available in the building.

77.     Defendant Zenelaj said, "Uh, try January."  When Plaintiff Becton asked when in January, she told him that "they haven't said anything yet" and to come back in a week or two.

78.     Defendant Zenelaj told Plaintiff Becton that the one-bedroom apartments cost "about $1550, $1600," despite having told White Tester 5 the day before that apartment 3G would rent for between $1450 and almost $1500.  She told Plaintiff Becton that he could call the superintendent cell phone or the building manager, Okun.  She told him that he could also inquire about other Parkoff buildings, naming the ones on Avenue I, on Beverly, and on Ocean Parkway.  She again stressed that there were no openings and there might only be something in January by saying: "They just told us last night that January. . ."

79.     When Plaintiff Becton said, "Ok, so I can come back in a couple weeks," Defendant Zenelaj equivocated, saying, "He didn't definitely definitely say, he was like I got a

lease renewal, I don't know, I don't think I'm gonna renew. So that's why he said around January."

80.     One hour later, White Tester 1 visited the Kings Highway Building and asked to speak to Defendant Zenelaj.  When White Tester 1 said she was looking for a one-bedroom apartment, Defendant Zenelaj immediately said, "3G, check it out. It's open now."

81.     Although Defendant Zenelaj had told Plaintiff Becton an hour before that one-bedroom apartments cost $1550 or $1600, she told White Tester 1 that apartment 3G would rent for $1450, and that the "highest" would be $1500.

82.     Defendant Zenelaj told White Tester 1 that if she liked apartment 3G, she should call the building manager and tell him that Defendant Zenelaj had showed her the apartment.

83.     White Tester 1 said, "Ok, so I just give him a call and say that I liked it. Ok. And it's available right away."  Defendant Zenelaj responded, "Yeah, 'cuz the tenants are breaking their lease," adding, "It's open now, if you want to go look at it."

## II.   Lawful Source of Income Discrimination at the Schenectady Building

84.     401 Schenectady Avenue (the "Schenectady Building") is a Parkoff-owned and/or managed apartment building with approximately 60 units located in Crown Heights, Brooklyn, a predominantly African American neighborhood.

85.     The Section 8 Voucher Program ("Section 8") is a federal program that provides housing subsidies to lower-income families so that they can obtain safe and affordable housing. New York City anti-discrimination law forbids landlords and brokers from refusing to rent apartments to individuals because they have Section 8 vouchers, or other lawful sources of income, to help pay their rent.

19

86.     In May 2017, FHJC testers visited the Schenectady Building to inquire about potential apartments.

87.     On May 15, 2017, at approximately 11:45 a.m., a male FHJC tester visited the Schenectady Building and spoke to Carlos Quintana, the superintendent.  Quintana told the tester that there was an apartment available for $1625 – a one-bedroom, and also another apartment available for $1925 that was a two-bedroom.

88.     Quintana gave the tester a phone number for the Parkoff management office.

89.     At approximately 2:00 p.m. the same day, the tester called the Parkoff office and spoke to Defendant Jennifer Conticelli, who upon information and belief is the leasing agent for the Schenectady Building.  Defendant Conticelli told him that the two-bedroom apartment (Apartment 3B), was $1895 per month, and that they had just received an application for it.  She told him that the one-bedroom apartment (Apartment 8A), was $1595 per month.  She explained that the deposit would be one month's rent, and that both apartments were available right away.

90.     The following day, on May 16, 2017, at approximately 3:30 p.m., another FHJC tester visited the Schenectady Building posing as a prospective tenant.  She spoke to Moriana, the superintendent's wife.  Moriana told the tester that Apartment 8A, the one-bedroom, was available.  She told the tester that she thought it rented for $1500.  Moriana told the tester to call the Parkoff office for more information.

91.     The same day, the tester called Parkoff and spoke to Defendant Conticelli.  Defendant Conticelli told the tester that there was an application pending on Apartment 8A, but that another Apartment 9E, was available "now" for $1595.

92.     Defendant Conticelli answered several of the tester's questions about the deposit, utilities, the application fee, and the length of the lease.  She told the tester to call her back after she visited Apartment 9E.

93.     The tester returned to the Schenectady Building and spoke to Quintana.  Quintana told her that Apartments 8A, 9E, and 3A were the available one-bedroom apartments, and they then together visited Apartments 9E and 3A.

94.     The tester then called Defendant Conticelli back.  The tester told her that she had viewed Apartments 9E and 3A, and that Quintana had given her an application.

95.     The tester asked if both apartments were $1595 per month, and Defendant Conticelli confirmed that they were.

96.     Defendant Conticelli told the tester to mail the application to her with supplemental documents listed on the application.

97.     The tester then said, "And . . . when I put all of these forms together for you and mail it in, I can also send you my Section 8 voucher with this information."

98.     Defendant Conticelli said, "Oh.  What you would need is an apartment that has already been approved for those programs.  These apartments are not."  She did not volunteer any information about any apartments that were approved for Section 8.  Instead, Defendant Conticelli added, "Um.  I don't have any available right now.  But if you are looking, um, you can try back at the end of June."

99.     When the tester asked whether Defendant Conticelli knew why the apartments were not approved for Section 8, she said, "Nope.  It's just, uh, it's just the decision, you know, they haven't been approved.  Not every apartment is."

100.    On May 18, 2017, at approximately 11:00 a.m., the same tester called Defendant

Conticelli again at the Parkoff 516 area code number.  She reminded Defendant Conticelli of

their conversation the previous day, and asked Defendant Conticelli for properties that did take

Section 8.

101.    Defendant Conticelli responded, "[I]n most of our buildings we do take it.  I don't

know which specific ones are going to come up, . . . if any, so I don't really have any other

information other than that."  When asked by the tester whether most of the buildings were in

Brooklyn and whether they had any in Queens or Manhattan, Defendant Conticelli responded,

"Yeah, we have both Queens and Brooklyn."  But she did not offer any specific information

about any buildings or specific apartments that would accept the voucher.

### III.    Family Status Discrimination by Parkoff Throughout Its Buildings

102.    One FHJC tester who visited the Kings Highway Building and the FHJC tester

who had visited the Schenectady Building in person both received lease applications that

contained a one-page rider imposing a requirement that children under seven years old who

would be living in the building must be tested for lead paint.

103.    The application rider states: "If a child [under age seven] has not been previously

screened for lead exposure, the applicant is required to submit each such child who has attained

at lease [sic] six months of age to medical lead screening as a condition of this application."

104.    The document, which was entitled "Rider to Lease Application," states that it was

"considered to be an integral part and made a part of the Lease Application" and that "the

Parkoff Organization reserves the right to deny tenancy to any applicant who fails to fully

comply with the requirements herein."

105.    During the May 18, 2017 phone call with Defendant Conticelli, the FHJC tester who had visited the Schenectady Building asked Defendant Conticelli about the one-page rider, stating that she had a five-year-old daughter.

106.    Defendant Conticelli stated that if the application were to be approved, the tester would be required to get her five-year-old tested for lead paint.  She said that it was a doctor's visit, and was part of an annual exam.

107.    The tester then said, "So if I had her screened from her previous exams, and I think it's within a year, then I could just submit that with the application, but if not, then I have to, once it's approved, get her screened and I pay for that."  Defendant Conticelli said, "Correct."

108.    On information and belief, the rider is routinely used by Parkoff for many, if not all, of the buildings throughout New York City that it owns, manages and/or controls.   In particular, the rider has been attached to applications affiliated with the following Parkoff-related buildings:  the Schenectady Building, the Kings Highway Building, 1420 Ocean Parkway, Brooklyn, New York; and 3300 Netherland Avenue, Bronx, New York.

*   *   *

109.    Defendants have engaged in an egregious pattern of discrimination, denying African Americans the opportunity to learn of or apply for available apartments at the Kings Highway Building, and effectively barring individuals who receive Section 8 assistance from the Schenectady Building.

110.    On multiple occasions, Defendant Zenelaj lied to African Americans about the availability and cost of apartments in the Kings Highway Building, telling them that nothing was available, even as she showed white applicants available apartments and actively tried to connect them with tenants who intended to leave.  Over the course of about a week in December 2016,

Defendant Zenelaj told the African-American testers that one-bedroom apartments cost between $1500 and $1650, while giving substantially lower estimates of $1428 to $1500 to the white testers.

111.     Defendants also refused to accept applications from renters receiving federal assistance, outright denying them any opportunity to apply for apartments at the Schenectady Building, and disingenuously telling them that other buildings would accept Section 8 without giving any concrete information about such opportunities.

112.     Finally, Defendants impose additional burdens on tenants with younger children, by requiring them to "submit" their children to a blood test, at their own expense, while not requiring any medical exams or tests from renters without young children.

113.     Defendants subjected individual Plaintiffs to debasement and humiliation, conveying to them that Defendants viewed them as lesser citizens than their white counterparts and that they were not welcome in the Kings Highway Building.  Defendants have interfered with FHJC's core mission and required FHJC to divert significant and scarce resources from other vital projects through all their different methods of discrimination.  Their behavior furthers racial segregation in housing in Midwood and in Crown Heights, Brooklyn, and throughout New York City.  This discrimination must end.

### FIRST CAUSE OF ACTION
(Federal Fair Housing Act – 42 U.S.C. § 3601 *et seq*.)

114.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

115.     Plaintiffs are aggrieved persons as defined in 42 U.S.C. §§ 3602(d) and (i), have been injured by Defendants' discriminatory conduct, and have suffered damages as a result.

116.    <u>Race Discrimination</u>:

    a.   Defendants' conduct as set forth above constitutes a refusal to rent, or the refusal to negotiate the rental of, or otherwise making unavailable, or a denial of housing on the basis of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

    b.   Defendants' conduct as set forth above constitutes discrimination in the terms, conditions, or privileges of the rental of a dwelling, and/or in the provision of services or facilities in connection therewith, because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(b).

    c.   Defendants' conduct as set forth above constitutes the making of statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race and color or an intention to make any such preference, limitation, or discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

    d.   Defendants' conduct as set forth above constitutes a representation, because of race or color, that a dwelling is not available for inspection or rental when such dwelling is in fact so available in violation of the Fair Housing Act, 42 U.S.C. § 3604(d).

117.    <u>Family Status Discrimination</u>: Defendants' conduct as set forth above constitutes discrimination in the terms, conditions, or privileges of the rental of a dwelling, and/or in the provision of services or facilities in connection therewith, because of familial status, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b).

118.     Defendants' unlawful conduct was intentional, willful, and made in disregard for the rights of others.

119.     Accordingly, pursuant to 42 U.S.C. §§ 3613(a) and (c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION
(Civil Rights Act of 1866 – 42 U.S.C. §§ 1981 and 1982)

120.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

121.     Defendants' conduct as set forth above prevented Plaintiffs from enjoying the same right to make and enforce contracts as is enjoyed by white citizens under Section 1981 of the Civil Rights Act of 1866 and the same right to lease or rent real property as is enjoyed by white citizens under Section 1982 of the Civil Rights Act of 1866.

122.     Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

123.     Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

124.     Accordingly, pursuant to 42 U.S.C. §§ 1981, 1982, and 1988, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
(New York Executive Law § 290 *et seq.*)

125.  Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

126.  <u>Race Discrimination</u>:

    a.  Defendants' conduct as set forth above constitutes the refusal to rent and/or the denial of a housing accommodation and/or the withholding of a housing accommodation because of race or color in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

    b.  Defendants' conduct as set forth above constitutes a representation that a housing accommodation is not available for rent or lease when in fact it is so available in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

    c.  Defendants' conduct as set forth above constitutes discrimination because of race or color in the terms, conditions, or privileges of the rental of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York Executive Law § 296(5)(a)(2).

127.  <u>Family Status Discrimination</u>: Defendants' conduct as set forth above constitutes discrimination because of familial status in the terms, conditions, or privileges of the rental of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York Executive Law § 296(5)(a)(2).

128.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by New York Executive Law § 296(5), in violation of the New York Executive Law § 296(6).

129.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

130.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

131.    Accordingly, pursuant to Article 15 of the New York Executive Law § 297, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
(New York Civil Rights Law § 40-c)

132.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

133.    New York Civil Rights Law§ 40-c(2) provides in relevant part that:  "No person shall, because of race, creed, color [or] national origin . . . be subjected to any discrimination in his or her civil rights . . . by any other person or by any firm, corporation or institution."

134.     By engaging in the discriminatory conduct as set forth above, Defendants violated New York Civil Rights Law § 40-c.

135.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

136.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

137.   At or before the commencement of this action, Plaintiffs will have provided notice of this action to the Attorney General of the State of New York per New York Civil Rights Law § 40-d.

138.   Accordingly, pursuant to New York Civil Rights Law § 40-c, Plaintiffs are entitled to statutory damages, injunctive relief, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
(New York City Administrative Code § 8-107 *et seq.*)

139.   Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

140.   Plaintiffs are aggrieved persons, as defined in the New York City Administrative Code § 8-502(a) and § 8-107(20).

141.   <u>Race Discrimination</u>:

    a.   Defendants' conduct as set forth above constitutes a refusal to rent or lease or other withholding of a housing accommodation because of race or color in violation of New York City Administrative Code § 8-107(5)(a)(1)(a).

    b.   Defendants' conduct as set forth above constitutes discrimination because of race or color with respect to the terms, conditions, or privileges of the rental or lease of a housing accommodation in violation of New York City Administrative Code § 8-107(5)(a)(1)(b).

    c.   Defendants' conduct as set forth above constitutes the declaring, printing, or causing to be declared or printed a statement or advertisement which expresses, directly or indirectly, a limitation, specification or discrimination as to race or color, in violation of the New York City Administrative Code § 8-107(5)(a)(2).

142.    Source of Income Discrimination:

    a.   Defendants' conduct as described above constitutes an unlawful discriminatory practice to refuse to rent or lease, refuse to negotiate for the rental or lease, represent that any housing accommodation is not available for rental or lease when in fact it is available, or otherwise withhold a housing accommodation because of lawful source of income, namely the Section 8 program, in violation of the New York City Administrative Code §§ 8-107(5)(a)(1).

    b.   Defendants' conduct as set forth above constitutes the declaring, printing, or causing to be declared or printed a statement or advertisement which expresses, directly or indirectly, a limitation, specification or discrimination as to lawful source of income, in violation of the New York City Administrative Code § 8-107(5)(a)(2).

143.    Family Status Discrimination:

    a.   Defendants' conduct as set forth above constitutes discrimination because children are, may be or would be residing in the home with respect to the terms, conditions, or privileges of the rental or lease of a housing accommodation or in the furnishing of facilities or services in connection therewith, in violation of New York City Administrative Code § 8-107(5)(a)(1)(b).

    b.   Defendants' conduct as set forth above constitutes declaring, printing or circulating, or causing to be declared, printed or circulated any statement, advertisement or publication, or using any form of application for the rental

or lease of a housing accommodation, or to make any record or inquiry in conjunction or connection with the prospective rental or lease of any housing accommodation, which expresses, directly or indirectly, a limitation, specification or discrimination as to whether children are, may be or would be residing with a person, or an intent to make such limitation, specification, or discrimination, in violation of the New York City Administrative Code § 8-107(5)(a)(2).

144.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden under New York City Administrative Code § 8-107(5), or attempting to do so, in violation of New York City Administrative Code § 8-107(6).

145.    Plaintiffs will have served a copy of this Complaint upon the City Commission on Human Rights and the Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

146.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

147.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

148.    Accordingly, pursuant to New York City Administrative Code § 8-502(a) and (g), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief and such other remedies as may be appropriate, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a.  An order and judgment declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*., the Federal Civil Rights Act, as amended, 42 U.S.C. §§ 1981, 1982, the New York State Human Rights Law, New York Executive Law § 290 *et seq*., and the New York City Human Rights Law, New York Administrative Code § 8-107 *et seq*.;

b.  An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from:

(i)  refusing to rent or lease, or refusing to negotiate for the rental or lease of, or otherwise making unavailable or denying a dwelling or housing accommodation to any person because of race or color, family status, or a lawful source of income;

(ii) discriminating against any person in the terms, conditions, or privileges of the rental or lease of a dwelling or housing accommodation, or in the provision of services or facilities in connection therewith, because of race or color, family status, or a lawful source of income;

(iii) Making statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race and color, family status, or a lawful source of income, or an intention to make any such preference, limitation, or discrimination;

(iv) Making a representation, because of race or color, family status, or a lawful source of income, that a dwelling is not available for rental when such dwelling is in fact so available;

32

(v) Aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the New York State Executive Law and New York City Human Rights Law; and/or

(iii) coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act, as amended;

c.   An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation to:

(i)  make all necessary modifications to their policies, practices, and procedures of offering rentals or leases of dwellings or housing accommodations to the public;

(ii) train all management, agents, and employees on fair housing laws;

(iii) display an Equal Opportunity logo (or statement to that effect) on all advertisements for dwellings and rental property and display in all offices HUD, state, and local fair housing posters;

(iv) allow monitoring of their rental screening and application process and decisions;

(v) retain records to allow for appropriate monitoring;

(vi) develop written procedures on rental and lease processes and fair housing policy to be distributed to all staff and all rental applicants;

(vii) undertake active efforts and steps to ensure that African Americans and persons on public assistance or families with young children seek out and obtain assistance from Defendants and are assisted in meaningful ways to rent and lease apartments; and

(vii) establish a system so that their employees or agents can be tested for unlawful discriminatory practices;

d.  An order and judgment awarding compensatory and punitive damages;

e.  An order and judgment awarding Plaintiffs' reasonable attorneys' fees, costs, interest

and expenses incurred in prosecuting this action; and

f.  Any further relief that may be just and proper.


Dated: New York, New York
      October 16, 2017

By: _Mariann_
     Mariann Meier Wang
     Heather Gregorio

CUTI HECKER WANG LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603


*Attorneys for Plaintiffs*